**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| PERSONAL AUDIO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD., | ) | |
| SAMSUNG ELECTRONICS AMERICA, INC., | ) | Case No._____ |
| SAMSUNG TELECOMMUNICATIONS | ) | |
| AMERICA, LP., RESEARCH IN MOTION | ) | **JURY TRIAL DEMANDED** |
| LTD., RESEARCH IN MOTION CORP., | ) | |
| MOTOROLA MOBILITY, INC., HIGH TECH | ) | |
| COMPUTER CORP., a/k/a HTC CORP., H.T.C. | ) | |
| (B.V.I.) CORP., HTC AMERICA INC., LG | ) | |
| ELECTRONICS, INC., AND LG | ) | |
| ELECTRONICS USA, INC. | ) | |
| | ) | |
| Defendants. | | |

**Complaint for Patent Infringement**

Plaintiff Personal Audio, LLC ("Personal Audio") for its cause of action against

Defendants, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung

Telecommunications America, LP (the Samsung entities collectively "Samsung"), Research in

Motion Ltd., Research in Motion Corp. (the Research in Motion entities collectively "RIM"),

Motorola Mobility, Inc. ("Motorola"), High Tech Computer Corp a/k/a HTC Corp., H.T.C.

(B.V.I.) Corp., HTC America Inc. (the HTC entities collectively "HTC"), LG Electronics, Inc.,

and LG Electronics USA, Inc. (the LG entities collectively "LG"), states and alleges on

knowledge and information and belief as follows:

**Parties**

1.      Plaintiff Personal Audio is a Texas limited liability company.

2.      Defendant Samsung Electronics Co., Ltd. is a Korean corporation having its principal place of business at 250 2-ga Taepyung-ro, Jung-gu, Seoul 100-742, Korea.

3.      Defendant Samsung Electronics America, Inc. is a New York corporation having its principal place of business at 105 Challenger Road, Ridgefield Park, NJ 07660. Samsung Electronics America, Inc. has been authorized to do business in the State of Texas by the Texas Secretary of State. Furthermore, Samsung Electronics America, Inc. has designated CT Corporation System, 350 N. Saint Paul Street, Suite 2900, Dallas, TX 75201, as its representative to accept service of process within the State of Texas.

4.      Defendant Samsung Telecommunications America, L.P. is a Delaware corporation having its principal place of business at 1301 E. Lookout Drive, Richardson, TX 75082.

5.      Defendant Research in Motion, Ltd. is a Canadian corporation, having its principal place of business at 295 Phillip Street, Waterloo, Ontario, Canada N2L 3W8.

6.      Defendant Research in Motion Corp. is a Delaware corporation, having its principal place of business at 122 West John Carpenter Parkway, Suite 430, Irving, Texas 75039. Research in Motion Corp. has been authorized to do business in the State of Texas by the Texas Secretary of State. Furthermore, Research in Motion Corp. has designated CT Corporation System, 350 N. Saint Paul Street, Suite 2900, Dallas, TX 75201, as its representative to accept service of process within the State of Texas.

7.      Defendant Motorola Mobility, Inc. is a Delaware corporation having its principal place of business at 600 North U.S. Highway 45, Libertyville, Illinois 60048. Motorola Mobility, Inc. has been authorized to do business in the State of Texas by the Texas Secretary of State. Furthermore, Motorola Mobility, Inc. has designated CT Corporation System, 350 N. Saint Paul

Street, Suite 2900, Dallas, TX 75201, as its representative to accept service of process within the State of Texas.

8.      Defendant HTC Corp. is a Taiwanese corporation having its principal place of business at 23 Xinghau Road, Taoyuan 330, Taiwan, Republic of China.

9.      Defendant HTC BVI is a British Virgin Islands corporation having its principal place of business at 3F, Omar Hodge Building, Wickhams Cay I, P.O. Box 362, Road Town, Tortola, British Virgin Islands.

10.     Defendant HTC America, Inc. is a Texas corporation having its principal place of business at 13920 SE Eastgate Way, Suite 400, Bellevue, Washington 98005. HTC America, Inc. has been authorized to do business in the State of Texas by the Texas Secretary of State. Furthermore, HTC America, Inc. has designated National Registered Agents, Inc., 16055 Space Center Boulevard, Suite 235, Houston, TX 77062, as its representative to accept service of process within the State of Texas.

11.     Defendant LG Electronics, Inc. is a Korean corporation having its principal place of business at LG Twin Towers 20, Yeouido-dong, Yeongdeunspo-gu, Seoul 150-721, Korea.

12.     Defendant LG Electronics USA, Inc. is a Delaware corporation having its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. LG Electronics USA, Inc. has been authorized to do business in the State of Texas by the Texas Secretary of State. Furthermore, LG Electronics USA, Inc. has designated United States Corporation Co., 211 E. 7th Street, Suite 620, Austin, TX 78701, as its representative to accept service of process within the State of Texas.

**Jurisdiction**

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), in that this action arises under the federal patent statutes, 35 U.S.C. §§ 271 and 281-285.

14.     This Court has personal jurisdiction over Samsung because it has committed acts giving rise to this action within Texas and within this judicial district and has established minimum contacts within the forum such that the exercise of jurisdiction over Samsung would not offend traditional notions of fair play and substantial justice. For example, Samsung has committed acts of infringement in this District, by among other things, offering to sell and selling products that infringe the asserted patents, including portable music players.

15.     This Court has personal jurisdiction over RIM because it has committed acts giving rise to this action within Texas and within this judicial district and has established minimum contacts within the forum such that the exercise of jurisdiction over RIM would not offend traditional notions of fair play and substantial justice. For example, RIM has committed acts of infringement in this District, by among other things, offering to sell and selling products that infringe the asserted patents, including portable music players.

16.     This Court has personal jurisdiction over Motorola because it has committed acts giving rise to this action within Texas and within this judicial district and has established minimum contacts within the forum such that the exercise of jurisdiction over Motorola would not offend traditional notions of fair play and substantial justice. For example, Motorola has committed acts of infringement in this District, by among other things, offering to sell and selling products that infringe the asserted patents, including portable music players.

17.     This Court has personal jurisdiction over HTC because it has committed acts giving rise to this action within Texas and within this judicial district and has established minimum contacts within the forum such that the exercise of jurisdiction over HTC would not offend traditional notions of fair play and substantial justice. For example, HTC has committed acts of infringement in this District, by among others things, offering to sell and selling products that infringe the asserted patent, including portable music players.

18.     This Court has personal jurisdiction over LG because it has committed acts giving rise to this action within Texas and within this judicial district and has established minimum contacts within the forum such that the exercise of jurisdiction over LG would not offend traditional notions of fair play and substantial justice. For example, LG has committed acts of infringement in this District, by among others things, offering to sell and selling products that infringe the asserted patent, including portable music players.

## **Venue**

19.     Venue in the Eastern District of Texas is proper pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(b) because the Defendants have committed acts within this judicial district giving rise to this action, and the Defendants have and continue to conduct business in this judicial district, including one or more acts of selling, using, importing and/or offering for sale infringing products or providing service and support to the Defendant's customers in this District.

20.     As stated in further detail in paragraphs 2-12, Samsung, RIM, Motorola, HTC, and LG have been authorized to do business in the State of Texas by the Texas Secretary of State and have each designated a registered agent to accept service of process within the State of Texas. Samsung Electronics America, Inc. and Research in Motion Corp. house their corporate headquarters and principal places of business in Texas.

21.     Venue in the Eastern District of Texas is also proper because Personal Audio is organized and governed by the limited liability company laws of Texas and is subject to taxes in Texas. Personal Audio maintains a registered agent for service of process in Texas. Personal Audio maintains office space in Beaumont, Texas, within this District, at 550 Fannin Street, Suite 500.  Personal Audio also maintains other contacts within this District, such as a bank account.

22.     Venue in the Eastern District of Texas is also proper because this District is centrally located to resolve common issues of fact among Personal Audio and the Defendants.

23.     Venue in the Eastern District of Texas is also proper because of judicial economy. Judge Ron Clark presided over *Personal Audio, LLC, v. Apple Inc. et al.,* Civil Action No. 9:09CV111 ("*Personal Audio v. Apple I*"). As part of that action the Court has construed the claims of the asserted patent in the Memorandum Opinions and Orders dated December 21, 2010 (Dkt. No. 258), January 31, 2011 (Dkt. No. 292), and May 18, 2011 (Dkt. No. 358).

## Background Allegations

24.     James Logan, the founder of Personal Audio, is a successful businessman and entrepreneur. In 1982, Logan founded MicroTouch Systems. Under Logan's stewardship MicroTouch became a leading developer of touch screen technologies used in a variety of consumer and commercial products. When Logan founded MicroTouch, the majority of touch screens used plastic surfaces for the contact interface. MicroTouch was one of the first companies to successfully manufacture and market touch screens with glass surfaces. MicroTouch's technology became the industry standard, and was widely used in retail outlets and purchased by large companies. By the mid-1990s, MicroTouch was the world's leading supplier of touch screen technology.

25.     For fourteen years, from 1982 until 1996, Logan served as MicroTouch's chief executive officer. MicroTouch had a single employee (Logan) when Logan started the company. By 1996, under Logan's leadership MicroTouch employed over 600 individuals and realized about $95 million in sales. In 2000, 3M purchased MicroTouch for about $160 million.

26.     Logan is a prolific inventor. Logan is listed as an inventor or co-inventor on no fewer than 32 United States patents. This lawsuit for patent infringement is about one of those patents.

27.     In 1996, Logan resigned as chief executive officer of MicroTouch. During his time at MicroTouch Logan had to commute to work every day. Logan became frustrated with the lack of radio listening options available during his commute.

28.     This frustration gave Logan a new idea for presenting audio programs -- an audio player for delivering personalized audio content based on the past listening habits or selections of an individual user. He therefore started a new company to develop, manufacture, and sell his new idea for an audio player.

29.     From 1996 until 1998, Logan served as the president of this new company. One of the first employees he hired was Daniel Goessling. Goessling is a software developer who had previously worked with Logan on developing a patented invention for pausing live television. Goessling is listed as an inventor or co-inventor on no fewer than 12 United States patents.

30.     In the spring of 1996 Logan also contacted Charles Call for the purpose of obtaining patent protection. Call is a patent attorney. Call has worked as a patent attorney for over fifty years. As a patent attorney, Call has extensive experience with computers and computer-related patents. Call has drafted over 500 United States patents. Call is also listed as an inventor or co-inventor on no fewer than 12 United States patents.

31.     By May of 1996, Call began drafting the application that became United States Patent Application No. 08/724,813 ("the '813 application"), for the purpose of obtaining patent protection for the personal audio player invention. The '813 application claimed, among other inventions, an audio player capable of receiving navigable playlists.

32.     On October 2, 1996, Call filed the '813 application with the United States Patent & Trademark Office ("PTO"). Logan, Goessling, and Call were listed as co-inventors of the '813 application.

33.     On March 6, 2001, the PTO issued United States Patent No. 6,199,076 entitled "Audio Program Player Including A Dynamic Program Selection Controller" ("the '076 patent"), a copy of which is attached as Exhibit 1.

34.     The '076 patent claims, among other inventions, a player that can reproduce a selection of audio program files, and is further capable of receiving a navigable playlist. The claimed player has the capability of using the received navigable playlist to allow a user to navigate among the audio files identified in the playlist during playback. Ex. 1 at 46:13-51, 47:38-48:29.

35.     The '076 patent specification describes an audio program player in a variety of hardware configurations. These hardware configurations include "an Internet server and PC client player architecture," "PDAs," a "portable computer," or a "simplified player for mobile use." *See* Ex. 1 at 7:41-66.

36.     The '076 patent specification describes several ways the player may receive data from outside the player. These ways include a "a radio or infrared link," "replaceable media," or "cellular radio, cable modem and or satellite links." *See* Ex. 1 at 7:41-8:4.

37.     The '076 patent specification describes several ways the player may store data, including data received from outside the player and audio files. These ways include "high speed RAM storage and a persistent mass storage device" or "replaceable media, such as an optical disk cartridge." *See* Ex. 1 at 4:36-38, 7:63-66.

38.     The '076 patent specification describes several ways that the player may reproduce audio signals in an audible form. These ways include a "sound card," "speakers," and a "headphone-out port." *See* Ex. 1 at 5:22-25.

39.     The '076 patent specification describes several types of manual controls with which the player may accept control commands from a user. These ways include a "keyboard," a "touchpad," or "a small number of buttons." *See* Ex. 1 at 5:26-29, 13:49-51, 36:41-42.

40.     The '076 patent specification describes that the player may be "advantageously implemented by . . . a processor." *See* Ex. 1 at 4:33-35.

41.     In addition to hardware components, the '076 patent discloses the use of software algorithms. These software algorithms include continuously playing audio files (Ex. 1 at 12:16-13:11; 34:28-35:44), detecting input commands (Ex. 1 at Fig. 3, steps 261, 262, 275, and 278), skipping forward to the next audio file in a playlist sequence (Ex. 1 at 15:21-25; 34:28-35:48), restarting playback of the currently playing audio file (Ex. 1 at 15:49-59), and skipping backward to the previous audio file in a sequence (Ex. 1 at 15:49-59; 34:28-35:53).

42.     The '076 patent is a foundational patent in the portable personal audio player industry. As evidenced by a forward reference search, attached as Exhibit 2, the '076 patent has been cited in no fewer than 233 issued United States patents.

43.     Personal Audio owns and maintains all rights to enforce the '076 patent.

44.     On June 25, 2009, Personal Audio sued Apple Inc. in the Eastern District of Texas for infringement of the '076 patent. Personal Audio alleged that Apple infringed the '076 patent by selling the iPod classic generations 1 through 6, iPod mini generations 1 and 2, iPod nano generations 1 through 5, iPod touch generations 1 through 3, iPhone, iPhone 3G, iPhone 3GS, and iPad.

45.     The Court, the Honorable Ron Clark presiding, held a jury trial from June 23 until July 8, 2011.

46.     During the trial Apple asserted that claims 1, 3, and 15 of the '076 patent were invalid as anticipated or obvious. For each asserted claim, Apple argued that it was anticipated by the DAD486x Digital Audio Delivery System Operation Manual ("DAD Manual") and DAD486x Digital Audio Delivery System ("DAD System"). Apple also argued that each of the asserted claims was rendered obvious by various combinations of the DAD Manual, DAD System, Sound Blaster 16 User's Guide for Windows 95, Microsoft Windows 95 Resource Kit manual, "Architecting Personalized Delivery of Multimedia Information" by S. Loeb, Musicshop Reference Manual, Sony Discman player and instructions, and Sony Minidisc player and instructions.

47.     On July 8, 2011, the jury by unanimous verdict found that Apple infringed claims 1, 3, and 15 of the '076 patent by selling the iPod classic generations 3 through 6, iPod mini generations 1 and 2, and iPod nano generations 1 through 5 in the United States. The jury awarded damages to Personal Audio in the amount of $8,000,000.00.

48.     The jury rejected all of Apple's invalidity arguments and found that claims 1, 3, and 15 of the '076 patent are not anticipated or obvious.

49.     On August 30, 2011, the Court ordered final judgment in favor of Personal Audio in the amount of $8,000,000.00 in damages, $4,182,331.00 in pre-judgment interest, post-judgment interest calculated at the rate of 0.11%, and costs of court.

## Count I

### Infringement of the '076 patent by Samsung

50.     Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein.

51.     Samsung manufacturers and sells handheld cellular telephones. One product that it manufactures and sells is the Samsung Continuum smart phone.

52.     When sold the Samsung Continuum is loaded with the Android OS 2.1 éclair operating system. Android OS 2.1 includes an application labeled "Music." This Music application makes the Continuum a music player capable of playing a group of audio files, such as songs, selected by the listener. A selected group of audio files arranged in a sequence is commonly known as a playlist.

53.     A number of components facilitate the Continuum's capability to reproduce a playlist of audio files. Samsung sells the Continuum with a microSD replaceable media storage card pre-installed. *See* Ex. 3 at 82 ("Music Player plays songs from an installed memory card."); Ex. 4 ("8 GB microSD card pre-installed on-device."). This microSD card provides the Continuum with the capability to store one or more audio files that a user may listen to with the Music application.

54.     Each audio file that the Continuum is capable of storing has a beginning and an end.

55.     The Continuum also has a USB port and a USB cable provided with it in the box when sold. The Continuum's user manual instructs that a consumer may transfer media content from a separate computer to the Continuum by connecting the Continuum and the computer with the USB cable. Ex. 3 at 102. Transferred media content may include audio files as well a playlist file. *Id.* at 12. These components provide the Continuum with the capability to receive a playlist file of audio files from outside the Continuum.

56.     The microSD replaceable media card pre-installed on the Continuum further provides the Continuum with the capability to store the received playlist file.

57.     The Continuum with the Music application has various commands to control playback of a playlist of audio files. These commands include playing a playlist; skip forward to the next song in the playing playlist; go back to the beginning of the playing song; and skip back to the previous song in the playing playlist. The Continuum has the capability to accept a control command from a user with its touch screen. The touch screen with keys that allow the Continuum to accept commands from a user is pictured below:



Ex. 3 at 82.

58.    The Continuum with the Music application has the capability to play a playlist of audio files in the order of the playlist sequence continuously and without entry of a control command. Hardware and software components furnish the Continuum with this capability. In particular, hardware components providing this capability include the Continuum's general purpose computer circuitry, audio codec, and an integrated speaker.

59.    The Continuum is a general purpose computer. The Continuum is made up of a processor, a power supply, and random access memory. These components are connected via a bus that transmits signals between the various components.

60.    The Continuum uses an audio codec with which to reproduce digitally compressed audio files stored by the Continuum on its microSD card. In particular, the application developer information for the Continuum shows that the Continuum is capable of reproducing audio files in numerous formats. *See* Ex. 3 at 15 ("Music Player, supporting WAV, MP3, AAC, AAC+, eAAC+, AMR-NB, AMR-WB, WMA (v9/10), EVRC, QCELP, MIDI, and SP-MIDI formats."). The Continuum necessarily includes an audio codec to decompress and convert audio files in digitally compressed audio file formats (such as MP3) into an analog form for listening.

61.    The Continuum has an on-board speaker that reproduces analog audio signals, including signals derived from an audio file that is part of playlist. The Continuum user manual identifies the speaker:



Ex. 3 at 18.

62.    The Continuum's Music application and Android OS 2.1 contain software algorithms to provide it with the capability to continuously play a playlist of audio files without input of a user commend; detect a user command to skip forward or backward in the playing playlist sequence; respond to a command to skip forward by discontinuing playback of the playing audio file and beginning playback of the next audio file in the playlist sequence; respond to a command to go back to the beginning of the presently playing audio file; and respond to a command to skip backward by discontinuing playback of the playing audio file and beginning playback of the previous audio file in the playlist sequence.

63.    The Continuum Music application is specifically programmed with the following software algorithm for continuous playback of a sequence of audio files, or its equivalent: (1) starting playback of a selected audio file at the playlist sequence index corresponding to the selected audio file; (2) when the playing audio file concludes, the index is incremented and the audio file corresponding to the new index is played; and (3) repeating step (2) until the end of the final audio file in the sequence is reached, at which time playback loops back to the first audio file in the sequence.

64.    The Continuum Music application has the capability to play a playlist continuously by using the offered "repeat all" function. The Continuum user manual shows how

to use the "repeat all" function. *See* Ex. 3 at 82 ("Repeat: Touch to repeat the current song, repeat all songs, or disable repeat mode.")

65.     The Continuum Music application is specifically programmed with the following software algorithm for allowing the Continuum to detect an entered command to skip forward to the next audio file in the playing playlist of audio files, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command; and (2) if determining that there is a command then employing a branch-type programming construct that calls an algorithm that performs the skip forward process.

66.     The Continuum Music application is specifically programmed with the following software algorithm for skipping forward to the next audio file in the playlist sequence, or its equivalent: (1) scanning forward in the playlist sequence to find the next audio file to play; (2) upon finding the next audio file in the sequence setting the index value to correspond to this next audio file; and (3) fetching and playing this next audio file.

67.     The Continuum Music application is specifically programmed with the following software algorithm for allowing the Continuum to detect an entered command to go back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command; and (2) if determining that there is a command then employing a branch-type process that calls an algorithm that performs the back process.

68.     The Continuum Music application is specifically programmed with the following software algorithm for going back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a

predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting playback to the beginning of the audio file; and (2) playing the audio file from its beginning.

69.     The Continuum Music application is specifically programmed with the following software algorithm for skipping backward to the previous audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting the resetting playback to the beginning of the audio file and playing the audio file from its beginning; (2) if the presently playing audio file has not played for a predetermined amount of time (about 2,000 milliseconds), scanning backward in the playlist sequence to find the previous audio file to play; (3) upon finding the previous audio file in the sequence setting the index value to correspond to this previous audio file; and (4) fetching and playing this previous audio file.

70.     Samsung has infringed and is infringing the '076 patent by making, using, selling, offering for sale, and/or importing, without authority, products and services, including at least the Samsung Continuum, that are covered by one or more claims of the '076 patent, literally and/or under the doctrine of equivalents. *See* Exhibit 5 (preliminary exemplary evidence of Samsung's infringement of the '076 patent).

71.     Samsung does not have a license or permission to use the claimed subject matter in the '076 patent.

72.     Personal Audio has been injured and has been caused significant financial damage as a direct and proximate result of Samsung's infringement of the '076 patent.

73.     Samsung will continue to infringe the '076 patent, and thus cause irreparable injury and damage to Personal Audio unless enjoined by this Court.

## Count II

### Infringement of the '076 patent by RIM

74.     Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein.

75.     RIM manufacturers and sells handheld cellular telephones. One product that it manufactures and sells is the BlackBerry Tour 9630 smart phone.

76.     When sold the BlackBerry Tour is loaded with a RIM-proprietary operating system that includes a media player. The media player application makes the BlackBerry Tour a music player capable of playing a group of audio files, such as songs, selected by the listener. A selected group of audio files arranged in a sequence is commonly known as a playlist.

77.     A number of components facilitate the BlackBerry Tour's capability to reproduce a playlist of audio files. RIM sells the BlackBerry Tour with a microSD replaceable media storage card in the box. This microSD card provides the BlackBerry Tour with the capability to store one or more audio files that a user may listen to with the media player application.

78.     Each audio file that the BlackBerry Tour is capable of storing has a beginning and an end.

79.     The BlackBerry Tour also has a USB port and a USB cable provided with it in the box when sold. The BlackBerry Tour's user manual instructs that a consumer may transfer media content from a separate computer to the BlackBerry Tour by connecting the BlackBerry Tour and the computer with the USB cable. Ex. 6 at 121 ("Using BlackBerry® Media Sync, you can synchronize specific iTunes playlists and Windows Media® Player playlists to your BlackBerry device or a random selection of your songs that are not in a playlist. 1. Connect your device to your computer. 2. On your computer, open the BlackBerry® Desktop Manager. 3. Click the

Media icon. 4. In the BlackBerry Media Sync section, click the Launch tab. 5. If necessary, in the drop-down list, select your music application. 6. Perform one of the following actions: • To synchronize specific playlists, select the check box beside one or more playlists….• To synchronize specific playlists as well as a random selection of your songs, select the check box beside one or more playlists. … 7. Click Sync Music. 8. Click OK. 9. Disconnect your device from your computer.") Transferred media content may include audio files as well a playlist file. *Id*. These components provide the BlackBerry Tour with the capability to receive a playlist file of audio files from outside the BlackBerry Tour.

80.     The microSD replaceable media card sold with the BlackBerry Tour further provides the BlackBerry Tour with the capability to store the received playlist file.

81.     The BlackBerry Tour media player has various commands to control playback of a playlist of audio files. These commands include playing a playlist; skip forward to the next song in the playing playlist; go back to the beginning of the playing song; and skip back to the previous song in the playing playlist. The BlackBerry Tour has the capability to accept a control command from a user with a touch screen. Ex. 6 at 103 ("Play the next or previous song … When playing a song, click the next or previous icon.")

82.     The BlackBerry Tour media player application has the capability to play a playlist of audio files in the order of the playlist sequence continuously and without entry of a control command. Hardware and software components furnish the BlackBerry Tour with this capability. In particular, hardware components providing this capability include the BlackBerry Tour's general purpose computer circuitry, audio codec, and an integrated speaker.

83.     The BlackBerry Tour is a general purpose computer. The BlackBerry Tour is made up of a processor, a power supply, and random access memory. These components are connected via a bus that transmits signals between the various components.

84.     The BlackBerry Tour uses an audio codec with which to reproduce digitally compressed audio files stored by the BlackBerry Tour on its microSD card. In particular, BlackBerry Tour user guide shows that the BlackBerry Tour is capable of reproducing audio files in numerous formats. *See* Ex. 6 at 120-21. The BlackBerry Tour necessarily includes an audio codec to decompress and convert audio files in digitally compressed audio file formats (such as MP3) into an analog form for listening.

85.     The BlackBerry Tour has an on-board speaker that reproduces analog audio signals, including signals derived from an audio file that is part of playlist.

86.     The BlackBerry Tour's media player contains software algorithms to provide it with the capability to continuously play a playlist of audio files without input of a user commend; detect a user command to skip forward or backward in the playing playlist sequence; respond to a command to skip forward by discontinuing playback of the playing audio file and beginning playback of the next audio file in the playlist sequence; respond to a command to go back to the beginning of the presently playing audio file; and respond to a command to skip backward by discontinuing playback of the playing audio file and beginning playback of the previous audio file in the playlist sequence.

87.     RIM has infringed and is infringing the '076 patent by making, using, selling, offering for sale, and/or importing, without authority, products and services, including at least the BlackBerry Tour, that are covered by one or more claims of the '076 patent, literally and/or

under the doctrine of equivalents. *See* Exhibit 7 (preliminary exemplary evidence of RIM's infringement of the '076 patent).

88.     RIM does not have a license or permission to use the claimed subject matter in the '076 patent.

89.     Personal Audio has been injured and has been caused significant financial damage as a direct and proximate result of RIM's infringement of the '076 patent.

90.     RIM will continue to infringe the '076 patent, and thus cause irreparable injury and damage to Personal Audio unless enjoined by this Court.

## Count III

### Infringement of the '076 patent by Motorola

91.     Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein.

92.     Motorola manufacturers and sells handheld cellular telephones. One product that it manufactures and sells is the Motorola Droid 2 Global smart phone.

93.     When sold the Motorola Droid 2 Global is loaded with the Android OS 2.2 Froyo operating system. Android OS 2.2 includes an application labeled "Music." This Music application makes the Droid 2 Global a music player capable of playing a group of audio files, such as songs, selected by the listener. A selected group of audio files arranged in a sequence is commonly known as a playlist.

94.     A number of components facilitate the Droid 2 Global's capability to reproduce a playlist of audio files. Motorola sells the Droid 2 Global with a microSD replaceable media storage card pre-installed. *See* Ex. 8 at 34 ("SD memory card (8 GB—included with your

phone).”). This microSD card provides the Droid 2 Global with the capability to store one or more audio files that a user may listen to with the Music application. *See id*.

95.     Each audio file that the Droid 2 Global is capable of storing has a beginning and an end.

96.     The Droid 2 Global also has a USB port and a USB cable provided with it in the box when sold. The Droid 2 Global's user manual instructs that a consumer may transfer media content from a separate computer to the Droid 2 Global by connecting the Droid 2 Global and the computer with the USB cable. Ex. 8 at 51. Transferred media content may include audio files as well a playlist file. These components provide the Droid 2 Global with the capability to receive a playlist file of audio files from outside the Droid 2 Global.

97.     The microSD replaceable media card pre-installed on the Droid 2 Global further provides the Droid 2 Global with the capability to store the received playlist file.

98.     The Droid 2 Global with the Music application has various commands to control playback of a playlist of audio files. These commands include playing a playlist; skip forward to the next song in the playing playlist; go back to the beginning of the playing song; and skip back to the previous song in the playing playlist. The Continuum has the capability to accept a control command from a user with its touch screen. The touch screen with keys that allow the Continuum to accept commands from a user is pictured below:



**Music Controls**

Ex. 8 at 33.

99.     The Droid 2 Global with the Music application has the capability to play a playlist of audio files in the order of the playlist sequence continuously and without entry of a control command. Hardware and software components furnish the Droid 2 Global with this capability. In particular, hardware components providing this capability include the Continuum's general purpose computer circuitry, audio codec, and an integrated speaker.

100.    The Droid 2 Global is a general purpose computer. The Droid 2 Global is made up of a processor, a power supply, and random access memory. These components are connected via a bus that transmits signals between the various components.

101.    The Droid 2 Global uses an audio codec with which to reproduce digitally compressed audio files stored by the Droid 2 Global on its microSD card. In particular, the application developer information for the Continuum shows that the Continuum is capable of reproducing audio files in numerous formats. *See* Ex. 8 at 34 ("Your phone can play many types of files: AAC, AMR, MP3, WAV, WmA, ACC+ and MIDI."). The Droid 2 Global necessarily

includes an audio codec to decompress and convert audio files in digitally compressed audio file formats (such as MP3) into an analog form for listening.

102.    The Droid 2 Global has an on-board speaker that reproduces analog audio signals, including signals derived from an audio file that is part of playlist.

103.    The Droid 2 Global Music application and Android OS 2.2 contain software algorithms to provide it with the capability to continuously play a playlist of audio files without input of a user commend; detect a user command to skip forward or backward in the playing playlist sequence; respond to a command to skip forward by discontinuing playback of the playing audio file and beginning playback of the next audio file in the playlist sequence; respond to a command to go back to the beginning of the presently playing audio file; and respond to a command to skip backward by discontinuing playback of the playing audio file and beginning playback of the previous audio file in the playlist sequence.

104.    The Droid 2 Global Music application is specifically programmed with the following software algorithm for continuous playback of a sequence of audio files, or its equivalent: (1) starting playback of a selected audio file at the playlist sequence index corresponding to the selected audio file; (2) when the playing audio file concludes, the index is incremented and the audio file corresponding to the new index is played; and (3) repeating step (2) until the end of the final audio file in the sequence is reached, at which time playback loops back to the first audio file in the sequence.

105.    The Droid 2 Global Music application has the capability to play a playlist continuously by using the offered "repeat all" function. The Droid 2 Global user manual shows how to use the "repeat all" function. *See* Ex. 8 at 35.

106.   The Droid 2 Global Music application is specifically programmed with the following software algorithm for allowing the Droid 2 Global to detect an entered command to skip forward to the next audio file in the playing playlist of audio files, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command; and (2) if determining that there is a command then employing a branch-type programming process that calls an algorithm that performs the skip forward process.

107.   The Droid 2 Global Music application is specifically programmed with the following software algorithm for skipping forward to the next audio file in the playlist sequence, or its equivalent: (1) scanning forward in the playlist sequence to find the next audio file to play; (2) upon finding the next audio file in the sequence setting the index value to correspond to this next audio file; and (3) fetching and playing this next audio file.

108.   The Droid 2 Global Music application is specifically programmed with the following software algorithm for allowing the Droid 2 Global to detect an entered command to go back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command; and (2) if determining that there is a command then employing a branch-type process that calls an algorithm that performs the back process.

109.   The Droid 2 Global Music application is specifically programmed with the following software algorithm for going back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting playback to the beginning of the audio file; and (2) playing the audio file from its beginning.

110.    The Droid 2 Global Music application is specifically programmed with the following software algorithm for skipping backward to the previous audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting the resetting playback to the beginning of the audio file and playing the audio file from its beginning; (2) if the presently playing audio file has not played for a predetermined amount of time (about 2,000 milliseconds), scanning backward in the playlist sequence to find the previous audio file to play; (3) upon finding the previous audio file in the sequence setting the index value to correspond to this previous audio file; and (4) fetching and playing this previous audio file.

111.    Motorola has infringed and is infringing the '076 patent by making, using, selling, offering for sale, and/or importing, without authority, products and services, including at least the Motorola Droid 2 Global, that are covered by one or more claims of the '076 patent, literally and/or under the doctrine of equivalents. *See* Exhibit 9 (preliminary exemplary evidence of Motorola's infringement of the '076 patent).

112.    Motorola does not have a license or permission to use the claimed subject matter in the '076 patent.

113.    Motorola's infringement of the '076 patent has been and is willful.

114.    The '076 patent was cited on the face of U.S. Patent 6,934,751 that issued on August 23, 2005, and is titled "Method and device for providing more accurate subscriber device billing." Motorola, Inc., the first assignee, assigned the patent to Motorola Mobility, Inc. on July 31, 2010.

115.    Before and at the time Motorola, Inc. assigned the '751 patent to Motorola Mobility, Inc, Motorola Mobility, Inc. was a wholly owned subsidiary of Motorola, Inc.

116.    During prosecution of the application that issued as the '751 patent the examiner rejected some of the application's claims under 35 U.S.C. § 103(a) as being obvious in view of the '076 patent combined with the knowledge of one of ordinary skill in the art.

117.    Motorola's knowledge of the '076 patent is evidenced at least by its citation to the '076 patent in its issued patent and discussion of the patent during prosecution of the application that issued as the '751 patent.

118.    Motorola disregarded an objectively high likelihood that the making, using, selling, and offering to sell the Droid 2 Global infringed the '076 patent.

119.    Personal Audio has been injured and has been caused significant financial damage as a direct and proximate result of Motorola's infringement of the '076 patent.

120.    Motorola will continue to infringe the '076 patent, and thus cause irreparable injury and damage to Personal Audio unless enjoined by this Court.

## Count IV

### Infringement of the '076 patent by HTC

121.    Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein

122.    HTC manufacturers and sells handheld cellular telephones. One product that it manufactures and sells is the HTC Droid Incredible 2 smart phone.

123.    When sold the HTC Droid Incredible 2 is loaded with the Android OS 2.2 operating system. Android OS 2.2 includes an application labeled "Music." This Music application makes the Incredible 2 a music player capable of playing a group of audio files, such as songs, selected by the listener. A selected group of audio files arranged in a sequence is commonly known as a playlist.

124.    A number of components facilitate the Incredible 2's capability to reproduce a playlist of audio files. HTC sells the Incredible 2 with a microSD replaceable media storage card pre-installed. *See* Ex. 10 at 12 ("You will find the following inside the box: … microSD™ Card Preinstalled."). This microSD card provides the Incredible 2 with the capability to store one or more audio files that a user may listen to with the Music application.

125.    Each audio file that the Incredible 2 is capable of storing has a beginning and an end.

126.    The Incredible 2 also has a USB port and a USB cable provided with it in the box when sold. The Incredible 2's user manual instructs that a consumer may transfer media content from a separate computer to the Incredible 2 by connecting the Incredible 2 and the computer with the USB cable. Ex. 10 at 118, 120. Transferred media content may include audio files as well a playlist file. *Id*. at 120. These components provide the Incredible 2 with the capability to receive a playlist file of audio files from outside the Incredible 2.

127.    The microSD replaceable media card pre-installed on the Incredible 2 further provides the Incredible 2 with the capability to store the received playlist file.

128.    The Incredible 2 with the Music application has various commands to control playback of playlist of audio files. These commands include playing a playlist; skip forward to the next song in the playing playlist; go back to the beginning of the playing song; and skip back to the previous song in the playing playlist. The Incredible 2 has the capability to accept a control command from a user with its touch screen. The touch screen with keys that allow the Incredible 2 to accept commands from a user is pictured below:



Ex. 10 at 236.

129.    The Incredible 2 with the Music application has the capability to play a playlist of audio files in the order of the playlist sequence continuously and without entry of a control command. Hardware and software components furnish the Incredible 2 with this capability. In particular, hardware components providing this capability include the Incredible 2's general purpose computer circuitry, audio codec, and an integrated speaker.

130.    The Incredible 2 is a general purpose computer. The Incredible 2 is made up of a processor, a power supply, and random access memory. These components are connected via a bus that transmits signals between the various components.

131.    The Incredible 2 uses an audio codec with which to reproduce digitally compressed audio files stored by the Incredible 2 on its microSD card. In particular, the application developer information for the Incredible 2 shows that the Incredible 2 is capable of reproducing audio files in numerous formats. *See* Ex. 10 at 120 ("You can sync audio files in these formats: *.aac, *.amr, *.m4a, *.mid, *.midi, *.mp3, *.ogg, *.wav, and *.wma."). The

Incredible 2 necessarily includes an audio codec to decompress and convert audio files in digitally compressed audio file formats (such as MP3) into an analog form for listening.

132.    The Incredible 2 has an on-board speaker that reproduces analog audio signals, including signals derived from an audio file that is part of playlist. The Incredible 2 user manual identifies the speaker:



Ex. 10 at 14.

133.    The Incredible 2's Music application and Android OS 2.2 contain software algorithms to provide it with the capability to continuously play a playlist of audio files without input of a user commend; detect a user command to skip forward or backward in the playing playlist sequence; respond to a command to skip forward by discontinuing playback of the playing audio file and beginning playback of the next audio file in the playlist sequence; respond to a command to go back to the beginning of the presently playing audio file; and respond to a command to skip backward by discontinuing playback of the playing audio file and beginning playback of the previous audio file in the playlist sequence.

134.    The Incredible 2 Music application is specifically programmed with the following software algorithm for continuous playback of a sequence of audio files, or its equivalent: (1) starting playback of a selected audio file at the playlist sequence index corresponding to the

selected audio file; (2) when the playing audio file concludes, the index is incremented and the audio file corresponding to the new index is played; and (3) repeating step (2) until the end of the final audio file in the sequence is reached, at which time playback loops back to the first audio file in the sequence.

135.    The Incredible 2 Music application has the capability to play a playlist continuously by using the offered "repeat all" function. The Incredible 2 user manual shows how to use the "repeat all" function. *See* Ex. 10 at 236-237.

136.    The Incredible 2 Music application is specifically programmed with the following software also contains an algorithm for allowing the Incredible 2 to detect an entered command to skip forward to the next audio file in the playing playlist of audio files, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command; and (2) if determining that there is a command then employing a branch-type programming construct that calls an algorithm that performs the skip forward process.

137.    The Incredible 2 Music application is specifically programmed with the following software algorithm for skipping forward to the next audio file in the playlist sequence, or its equivalent: (1) scanning forward in the playlist sequence to find the next audio file to play; (2) upon finding the next audio file in the sequence setting the index value to correspond to this next audio file; and (3) fetching and playing this next audio file.

138.    The Incredible 2 Music application is specifically programmed with the following software algorithm for allowing the Incredible 2 to detect an entered command to go back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command;

and (2) if determining that there is a command then employing a branch-type process that calls an algorithm that performs the back process.

139.    The Incredible 2 Music application is specifically programmed with the following software algorithm for going back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting playback to the beginning of the audio file; and (2) playing the audio file from its beginning.

140.    The Incredible 2's Music application is specifically programmed with the following software algorithm for skipping backward to the previous audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting the resetting playback to the beginning of the audio file and playing the audio file from its beginning; (2) if the presently playing audio file has not played for a predetermined amount of time (about 2,000 milliseconds), scanning backward in the playlist sequence to find the previous audio file to play; (3) upon finding the previous audio file in the sequence setting the index value to correspond to this previous audio file; and (4) fetching and playing this previous audio file.

141.    HTC has infringed and is infringing the '076 patent by making, using, selling, offering for sale, and/or importing, without authority, products and services, including at least the HTC Droid Incredible 2, that are covered by one or more claims of the '076 patent, literally and/or under the doctrine of equivalents. *See* Exhibit 11 (preliminary exemplary evidence of HTC's infringement of the '076 patent).

142.    HTC does not have a license or permission to use the claimed subject matter in the '076 patent.

143.     Personal Audio has been injured and has bee caused significant financial damage as a direct and proximate result of HTC's infringement of the '076 patent.

144.     HTC will continue to infringe the '076 patent, and thus cause irreparable injury and damage to Personal Audio unless enjoined by this Court.

### Count V

### Infringement of the '076 patent by LG

145.     Personal Audio restates and realleges each of the allegations set forth above and incorporates them herein

146.     LG manufacturers and sells handheld cellular telephones. One product that it manufactures and sells is the LG Revolution smart phone.

147.     When sold the LG Revolution is loaded with the Android OS 2.2 operating system. Android OS 2.2 includes an application labeled "Music." This Music application makes the Revolution a music player capable of playing a group of audio files, such as songs, selected by the listener. A selected group of audio files arranged in a sequence is commonly known as a playlist.

148.     A number of components facilitate the Revolution's capability to reproduce a playlist of audio files. LG sells the Revolution with a microSD replaceable media storage card pre-installed. *See* Ex. 12 ("microSD™ Memory Slot: 16 GB card included"). This microSD card provides the Revolution with the capability to store one or more audio files that a user may listen to with the Music application.

149.     Each audio file that the Revolution is capable of storing has a beginning and an end.

150.    The Revolution also has a USB port and a USB cable provided with it in the box when sold. The Revolution's user manual instructs that a consumer may transfer media content from a separate computer to the Revolution by connecting the Revolution and the computer with the USB cable. Ex. 12 at 149. Transferred media content may include audio files as well a playlist file. These components provide the Revolution with the capability to receive a playlist file of audio files from outside the Revolution.

151.    The microSD replaceable media card pre-installed on the Revolution further provides the Revolution with the capability to store the received playlist file.

152.    The Revolution with the Music application has various commands to control playback of playlist of audio files. These commands include playing a playlist; skip forward to the next song in the playing playlist; go back to the beginning of the playing song; and skip back to the previous song in the playing playlist. The Revolution has the capability to accept a control command from a user with its touch screen. The touch screen with keys that allow the Revolution to accept commands from a user is pictured below:



Ex. 12 at 152.

153.    The Revolution with the Music application has the capability to play a playlist of audio files in the order of the playlist sequence continuously and without entry of a control

command. Hardware and software components furnish the Revolution with this capability. In particular, hardware components providing this capability include the Revolution's general purpose computer circuitry, audio codec, and an integrated speaker.

154.    The Revolution is a general purpose computer. The Revolution is made up of a processor, a power supply, and random access memory. These components are connected via a bus that transmits signals between the various components.

155.    The Revolution uses an audio codec with which to reproduce digitally compressed audio files stored by the Revolution on its microSD card. In particular, the application developer information for the Revolution shows that the Revolution is capable of reproducing audio files in numerous formats. *See* Ex. 12 at 149 ("The Music application supports audio files in numerous formats, including MP3, M4A (DRM-free AAC files, from iTunes®), AMR, MIDI, and OGG Vorbis."). The Revolution necessarily includes an audio codec to decompress and convert audio files in digitally compressed audio file formats (such as MP3) into an analog form for listening.

156.    The Revolution has an on-board speaker that reproduces analog audio signals, including signals derived from an audio file that is part of playlist. Ex. 12 at 151 ("You can listen to music using the phone's built-in speak …")

157.    The Revolution Music application and Android OS 2.2 contain software algorithms to provide it with the capability to continuously play a playlist of audio files without input of a user commend; detect a user command to skip forward or backward in the playing playlist sequence; respond to a command to skip forward by discontinuing playback of the playing audio file and beginning playback of the next audio file in the playlist sequence; respond to a command to go back to the beginning of the presently playing audio file; and respond to a

command to skip backward by discontinuing playback of the playing audio file and beginning playback of the previous audio file in the playlist sequence.

158.    The Revolution Music application is specifically programmed with the following software algorithm for continuous playback of a sequence of audio files, or its equivalent: (1) starting playback of a selected audio file at the playlist sequence index corresponding to the selected audio file; (2) when the playing audio file concludes, the index is incremented and the audio file corresponding to the new index is played; and (3) repeating step (2) until the end of the final audio file in the sequence is reached, at which time playback loops back to the first audio file in the sequence.

159.    The Revolution Music application has the capability to play a playlist continuously by using the offered "repeat all" function. The Revolution user manual shows how to use the "repeat all" function. *See* Ex. 12 at 152 ("Touch to set repeat mode to repeating all songs, repeat current song, or repeat off.")

160.    The Revolution Music application is specifically programmed with the following software algorithm for allowing the Revolution to detect an entered command to skip forward to the next audio file in the playing playlist of audio files, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command; and (2) if determining that there is a command then employing a branch-type programming construct that calls an algorithm that performs the skip forward process.

161.    The Revolution's Music application is specifically programmed with the following software algorithm for skipping forward to the next audio file in the playlist sequence, or its equivalent: (1) scanning forward in the playlist sequence to find the next audio file to play;

(2) upon finding the next audio file in the sequence setting the index value to correspond to this next audio file; and (3) fetching and playing this next audio file.

162.    The Revolution's Music application is specifically programmed with the following software algorithm for allowing the Revolution to detect an entered command to go back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) employing an if-then-else-type programming construct to identify the presence of an entered control command; and (2) if determining that there is a command then employing a branch-type process that calls an algorithm that performs the back process.

163.    The Revolution's Music application is specifically programmed with the following software algorithm for going back to the beginning of a playing audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting playback to the beginning of the audio file; and (2) playing the audio file from its beginning.

164.    The Revolution's Music application is specifically programmed with the following software algorithm for skipping backward to the previous audio file in the playlist sequence, or its equivalent: (1) determining whether the playing audio file has played for a predetermined amount of time (in this case about 2,000 milliseconds), and if so resetting the resetting playback to the beginning of the audio file and playing the audio file from its beginning; (2) if the presently playing audio file has not played for a predetermined amount of time (about 2,000 milliseconds), scanning backward in the playlist sequence to find the previous audio file to play; (3) upon finding the previous audio file in the sequence setting the index value to correspond to this previous audio file; and (4) fetching and playing this previous audio file.

165.    LG has infringed and is infringing the '076 patent by making, using, selling, offering for sale, and/or importing, without authority, products and services, including at least the LG Revolution, that are covered by one or more claims of the '076 patent, literally and/or under the doctrine of equivalents. *See* Exhibit 13 (preliminary exemplary evidence of LG's infringement of the '076 patent).

166.    LG does not have a license or permission to use the claimed subject matter in the '076 patent.

167.    Personal Audio has been injured and has been caused significant financial damage as a direct and proximate result of LG's infringement of the '076 patent.

168.    LG will continue to infringe the '076 patent, and thus cause irreparable injury and damage to Personal Audio unless enjoined by this Court.

## Prayer for Relief

**WHEREFORE**, Plaintiff Personal Audio prays for the following relief:

1.    A declaration that the Defendants have infringed the '076 patent, and are liable to Personal Audio for infringement;

2.    An award of damages adequate to compensate Personal Audio for Defendants' infringement of the '076 patent;

3.    A post-judgment equitable accounting of damages for the period of infringement of the '076 patent established by Personal Audio at trial;

4.    An order enjoining the Defendants from infringing the '076 patent;

5.    If a permanent injunction is not granted, a judicial determination of the conditions for future infringement such as a royalty bearing compulsory license or such other relief as the Court deems appropriate;

6.      A finding that this case is exceptional pursuant to 35 U.S.C. § 285;

7.      An award of prejudgment interest, costs and disbursements, and attorney fees; and

8.      Such other and further relief as the Court deems Personal Audio may be entitled

to in law and equity.

## DEMAND FOR TRIAL BY JURY

Personal Audio demands a jury trial on all issues so triable, pursuant to Rule 38 of the

Federal Rules of Civil Procedure.


Dated: September 9, 2011                    Respectfully submitted,

                                           By:____/s/ Charles W. Goehringer Jr._____
                                           **Robins, Kaplan, Miller & Ciresi L.L.P.**
                                           Ronald J. Schutz   (MN Bar No. 130849)
                                           (Eastern District of Texas Member)
                                           (Lead Counsel)
                                           Jake M. Holdreith  (MN Bar No. 211011)
                                           (Eastern District of Texas Member)
                                           Cyrus A. Morton (MN Bar No. 287325)
                                           (Eastern District of Texas Member)
                                           David A. Prange (MN Bar No. 329976)
                                           (Eastern District of Texas Member)
                                           Patrick M. Arenz  (MN Bar No. 0386537)
                                           (Eastern District of Texas Member)
                                           Daniel R. Burgess (MN Bar No. 0389976)
                                           (Eastern District of Texas Member)
                                           800 LaSalle Avenue, Suite 2800
                                           Minneapolis, Minnesota 55402
                                           Telephone: (612) 349-8500
                                           Facsimile:  (612) 339-4181
                                           E-mail:    RJSchutz@rkmc.com
                                                      JMHoldreith@rkmc.com
                                                      CAMorton@rkmc.com
                                                      DAPrange@rkmc.com
                                                      PMArenz@rkmc.com
                                                      DRBurgess@rkmc.com

                                           Annie Huang        (MN Bar No. 0327979)
                                           (Eastern District of Texas Member)
                                           601 Lexington Avenue, Suite 3400

New York, NY 10022
Telephone:   (212) 980-7400
Facsimile:   (212) 339-4181
E-mail:         AHuang@rkmc.com

**Germer Gertz, L.L.P.**
Lawrence Louis Germer
(TX Bar # 07824000)
Charles W. Goehringer, Jr.
(TX Bar # 00793817)
550 Fannin, Suite 400
P.O. Box 4915
Beaumont, Texas 77701
Telephone: (409) 654-6700
Telecopier: (409) 835-2115
E-Mail:   llgermer@germer.com
                cwgoehringer@germer.com

**Attorneys for Plaintiff Personal Audio, LLC**