**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| Personal Audio, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:11-cv-00432-RC |
| v. | ) | |
| | ) | **Jury Trial Demanded** |
| HTC Corp., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>Personal Audio's Responsive Claim Construction Brief</u>

# TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................................... iii

Introduction .................................................................................................................. 1

Background ................................................................................................................... 1

Argument ...................................................................................................................... 7

I.  The Court should not change its proposed construction for "sequencing file" terms, as HTC has not shown a disclaimer of claim scope. ............................................. 7

    A.  Personal Audio's statements in reexamination proceedings do not constitute disclaimers because they do not narrow the scope of the claims .................................. 7

    B.  HTC's proposed construction is unnecessary so long as "used by the processor" is understood as that phrase has been consistently used by Personal Audio ........................................................................................................... 9

    C.  If further construction is necessary, "used by the processor" should be given its plain and ordinary meaning ..................................................................... 10

II. The Court's "Continuous Playback" algorithm is complete and sufficient to perform the corresponding function ...................................................................... 11

    A.  HTC's proposed construction is not supported by the specification ............................ 12

    B.  HTC's proposed construction includes structure not necessary to perform the recited function ................................................................................................. 13

    C.  The Court's previously identified algorithmic structure would work on a sequencing file like the one shown in Figure 5 ........................................... 15

III. The "Continuous Play" Algorithm Does Not Require an Endless Circular Loop ................ 16

IV. The algorithm identified by the Court for the "Go" command is complete and sufficient to perform the corresponding function ................................................... 18

V.  The "downloading" limitation does not require a request for a specific file, only a request to initiate a data transfer ........................................................................ 21

    A.  HTC's proposed construction would improperly import limitations from the specification into the claims ......................................................................... 22

    B.  HTC's construction is inconsistent with a preferred embodiment of the invention ............................................................................................................... 23

i

VI. The language of the preambles provides meaning and vitality to the claims..........................24

Conclusion ...............................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc.,*
    674 F.3d 1365 (Fed. Cir. 2012)................................................................................... 10

*Am. Med. Sys., Inc. v. Biolitec, Inc.,*
    618 F.3d 1354 (Fed. Cir. 2010).................................................................................... 25

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.,*
    206 F.3d 1440(Fed. Cir. 2000)..................................................................................... 18

*Comark Commc'ns, Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998).................................................................................... 18

*Elbex Video v. Sensormatic Elecs. Corp.,*
    508 F.3d 1366 (Fed. Cir. 2007)..................................................................................... 7

*Minks v. Polaris Indus., Inc.,*
    546 F.3d 1364 (Fed. Cir. 2008).................................................................................... 12

*Nazomi Commc'ns, Inc. v. ARM Holdings, PLC,*
    403 F.3d 1364 (Fed. Cir. 2005).................................................................................... 18

*Northrop Grumman Corp. v. Intel Corp.,*
    325 F.3d 1346(Fed. Cir. 2003)..................................................................................... 13

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003).................................................................................... 14

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH,*
    386 F.3d 1133 (Fed. Cir. 2004).................................................................................... 23

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).............................................................................. 10, 23

*Reinshaw PLC v. Marposs Societa Per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998).................................................................................... 22

## Introduction

In *Personal Audio LLC v. Apple Inc., et al.*, this Court construed twenty-one claim terms across the asserted '076 and '178 patents. The Court, the parties of record, and a court-appointed expert devoted significant resources to construe these claim terms. The Court issued two claim construction orders,[1] an order on reconsideration that further modified many of the algorithm constructions,[2] and two additional orders on narrow issues that arose close to trial.[3] For many of the claim terms, the Court crafted detailed algorithms based on the specification, which must then be compared to accused source code for the jury to decide infringement.

Now, the same patent claims are at issue, and all of the terms HTC has proposed were previously construed by this Court in the *Apple* case. Despite the enormous detail in the Court's original constructions, HTC seeks to add even greater detail to further narrow the claims to manufacture additional source-code-based noninfringement arguments. HTC's proposals are results-oriented and not supported by the intrinsic record or the canons of claim construction, and should thus be rejected.[4]

## Background

**The Patented Invention.**

When the patents-in-suit were filed in 1996, consumers had few options for personalized, customizable content. There were no portable MP3 players, Internet radio had just been introduced, and tapes and CDs limited a listener to a list of predetermined audio tracks in a predetermined order. Seeking to remedy this problem, the inventors of the '076 and '178 patents

---

[1]     *See* Case No. 9:09-cv-111, D.I. 258 (Dec. 21, 2010) and 292 (Jan. 31, 2011), attached to this brief as Exhibit A and Exhibit B, respectively.

[2]     *See* Case No. 9:09-cv-111, D.I. 358 (May 18, 2011), attached to this brief as Exhibit C.

[3]     *See* Case No. 9:09-cv-111, D.I. 363 (May 23, 2011) and 430 (June 21, 2011).

[4]     Out of an abundance of caution, Personal Audio hereby renews its objections to the Court's claim construction as set forth in its letter of May 14, 2012. Personal Audio's argument for adoption of the claim constructions from the *Apple* case is not a waiver of those objections for the purposes of preserving issues for appeal.

designed an entire system, including a personal audio player that could receive or download navigable playlists as described in the patents.

The asserted claims cover some aspects of one part of that system – a personal audio player. The claims relate to navigating through and reproducing audio program files using a separate sequencing file. However, the specification also describes optional features that were not included as limitations on the claims. For example, in addition to reproducing audio program files, such as songs and news stories, the specification describes an optional embodiment whereby a user can perform high-level skipping through "topics" and "subjects," rather than individual program segments. Similarly, the specification describes "hyperlink" and "highlight" passages that allow the user to listen to only the important parts of an audio program segment, or to navigate to news stories through selecting a link during playback of an audio file.

The inventors made it clear, however, that high-level skipping and hyperlink jumping are not required for a working audio program player. Instead, these features are optional, identified in the specification with permissive language.[5] These features may be included in non-asserted claims, or other related applications and issued patents, but not the asserted claims. At trial, Charles Call, one of the inventors, characterized these optional features as "bells and whistles":

> Figure 5 is an example of – if you're doing a whole bunch of things with a sequencing file, it's an example of what might be in a complicated sequencing file if you're doing lots of things. . . . [W]hat I was trying to describe in terms of more bells and whistles is this elaborate mechanism where you can do the skipping in this hierarchical structure; and it says if you want to do that, then you have this two-level skip command structure. That's an option that's available. I'm basically saying you can do it the simple way; or, if desired, you can do it the more complicated way. The more complicated way is shown in Figure 5.

---

[5]     *See* '076 patent, col. 15, ll. 21-30 ("the SKIP command indicated at 275 in FIG. 3 causes the player to advance to the beginning of the next program segment in the program sequence . . . *[i]f desired*, SKIP commands may be subdivided into two types, a SKIP TOPIC command and a SKIP SUBJECT command") (emphasis added); col. 30, ll. 60-62 ("[t]o further facilitate rapid skimming, the player *may be adapted* to support playback in what is here termed the 'play highlights' mode") (emphasis added); col. 31, ll. 13-14 ("[i]n addition, the structured program files *may advantageously contain*, where appropriate, 'hyperlink' passages . . . ") (emphasis added)

Ex. D at 542:18-21; 543:15-23. This testimony is corroborated by the language of the asserted claims. The player claimed in the asserted patents is for reproducing and navigating through "selected audio program segments." None of the claims at issue in this case claim any ability to have, play, or skip Subjects or Topics, or to reproduce or navigate through "hyperlink passages," "highlight passages," or many other bells or whistles described in the specification.

**The Sequencing File – Personal Audio's consistent position throughout litigation and reexamination.**

The independent claims of the '076 and '178 patents state that the file of data received by the player is also the file of data that is stored and used by the processor for playback of the sequence of audio files. Claim 1 of the '076 patent claims both receipt and storage of the file of data:

> means for receiving and storing a file of data establishing a sequence in which said program segments are scheduled to be reproduced by said player.

Claim 1 of the '178 patent similarly claims a sequencing file received and stored by the player:

> a communications port . . . for downloading . . . a separate sequencing file;
>
> a digital memory unit . . . for persistently storing . . . said separate sequencing file.

As demonstrated by claim 1 of the '076 patent, this received and stored sequencing file is used by the processor for playback and navigation of the audio files specified by the sequence in the sequencing file:

> means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command.

Claim 1 of the '178 patent recites the same functionality:

> a processor for continuously delivering a succession of said audio program files in said collection to said audio output unit in said ordered sequence specified by said sequencing file in the absence of a program selection command from said listener.

In the *Apple* case the meaning of "sequencing file" and its variants was a contested issue. Personal Audio originally advocated that the construction should include language instructing that the sequencing file is "used by the processor to both control playback of each audio program segment in the order sequence and respond to control commands." *See* Ex. A at 18. The Court rejected this argument, stating that the additional limitations (such as "used by the processor") "incorporate[] limitation[s] that are present elsewhere in the claim language." *Id*. at 18. The specification and claims disclose that the sequencing file received and persistently stored is also the file used by the processor to control playback and navigation. *Id*. at 18-19. Personal Audio did not and does not challenge the Court's finding that the claim language itself provides those limitations.

This characteristic of the sequencing file and the invention as a whole was significant in Apple's validity challenges of the patents. Apple filed an *inter partes* reexamination proceeding challenging the validity of the '178 patent.[6] The PTO found there was a substantial question of patentability based on the disclosure of the DAD Manual. The DAD Manual discloses a computerized replacement for cart machines in a radio station. In its attempt to read such a system onto the claims of the '178 patent, the PTO cited to the IMPORT PLAYLIST function.[7] Ex. F at 4-5. The IMPORT PLAYLIST FUNCTION comprises many steps:

---

[6]     Apple also challenged the validity of the '178 patent at trial, as well as the validity of the '076 patent. At trial a jury found the both patents valid. In an *ex parte* reexamination proceeding also initiated by Apple the USPTO recently found the claims to be valid over the DAD Manual. *See* Ex. E.

[7]     The PTO identified a second passage in the DAD Manual that also allegedly disclosed the "downloading" limitation of a sequencing file. *See* Ex. F at 5. Personal Audio distinguished that disclosure on a different basis that is not relevant to the present discussion.

(1)     In network mode (or local mode) of the DAD System, the user of the DAD system initiates the IMPORT PLAYLIST function by selecting the source data file to use. The user must place the source data file in the appropriate DAD sub-directory on the same drive that launched the DAD application (the "native drive"). *See* Ex. G at 128:6-129:25; Ex. H at 7-20.

(2)     The user then initiates the IMPORT PLAYLIST process by the selections PLAYLIST (bar), NEW (button), IMPORT (button). Ex. H at 7-20. Thereafter the user may select the specific source data file. The translation of the source data file is not done automatically. Ex. G at 123:9-18.

(3)     The user-selected source data file is loaded into random access memory (working memory). *See* Ex. G at 128:6-129:25.

(4)     Once in working memory, the DAD system will translate the source data file into a DAD playlist when the user presses IMPORT (button). Ex. H at 7-20. Thereafter, the DAD playlist is then saved back to the same drive that launched the DAD application (i.e. if launched from the network f:\ drive, the DAD playlist file is saved back to the f:\ drive). Ex. G at 128:6-129:25.

The resulting DAD playlist created from the IMPORT PLAYLIST function is the file that is used by the DAD System to control playback. *See* Ex. H at 7-19 ("In most cases these systems create data files that can be read and translated into DAD playlist using the **IMPORT** feature of the <u>PLAYLIST</u> screen.") (emphasis in original). In the *Apple* case and here, the significant fact about the DAD Manual and DAD System is that the file pointed to by the USPTO (the source data file) is not the file that is used by the DAD System to control playback. Unlike in the inventions described in the '076 and '178 patents, the files that are received, persistently stored, and used in the DAD system are different files.

Personal Audio distinguished the DAD Manual (in part) based on the specific sequencing file used by the player. The DAD source data file received by the DAD system did not satisfy the sequencing file limitation because the DAD source data file was not used for playback:

The Examiner relies on a DAD "import" function for copying a so-called "playlist." [OA at 4] However, the source data file accessed by the DAD "import" function is not an operative "playlist" itself but is instead what the DAD Manual

> refers to as "source data files" which the DAD system can (e.g., after manual editing) use to eventually create a playlist.

Ex. I at 11. Like the above quotation, the other excerpts identified in HTC's brief when considered in the context of Personal Audio's conversation with the PTO reflect that the discussion of "use" of the sequencing file is about *what* file is used for playback and navigation. The conversation is not about *how* the file is used, as HTC appears to assert in its brief.

In *Personal Audio v. Apple*, defendant Apple also attempted to exploit the meaning of "use" of the sequencing file by misconstruing the meaning of Personal Audio's proposed construction. Personal Audio explained Apple's ploy in its Technology Synopsis:

> The parties have a dispute as to how the sequencing file is used by the player to respond when a user enters a playback command – for example, when the user pushes play or a skip button. In particular, the parties have a dispute as to whether the processor controlling the response to the button must read the sequencing file from persistent storage each time a button is pressed, or whether the processor can keep data read from the sequencing file in more accessible storage (such as RAM) so it can be used more easily and faster. This synopsis therefore reviews how a processor works with persistent storage, and how it works with RAM.
>
> Notably, Apple's proposed definition of sequencing file – "a file specifying the predetermined playback order" – does not provide the limitation of "accessing" the sequencing file in response to a command that Apple suggested in its brief. The additional limitation of "accessing" the sequencing file is only Apple's mischaracterization of Personal Audio's definition. Thus, Personal audio is addressing the technology at issue, which helps show that Personal Audio's definition is clear and does not require reading the sequencing file from persistent memory, into RAM, in response to each control command.

Ex. J at 2-3. Personal Audio then addressed how computers generally work when "using" a file. Ex. J at 6-7; *See also* Ex. K at 23. At trial Apple still argued that the use during playback of an "in-memory representation" of the data from a file stored in persistent storage was non-infringing. *See* Ex. L at 1736-38, 2002-05; Ex. M. The jury rejected this argument.

Personal Audio suspects that HTC, like Apple, is and will be attempting to misconstrue Personal Audio's arguments in a manner that is inconsistent with the claims,

specification, file history, and the understanding of a person of ordinary skill in the art of how computers work to use files stored in persistent storage.

Argument

**I.   The Court should not change its proposed construction for "sequencing file" terms, as HTC has not shown a disclaimer of claim scope.**

This Court should adopt its prior construction for the "sequencing file" terms. HTC's only argument for its proposed construction is that Personal Audio disclaimed claim scope during reexamination proceedings. HTC spends nearly half of its brief on this one argument, yet does not explain *why* its proposed construction is necessary. This question is especially relevant, given that the Court has previously recognized that the construction HTC seeks is unnecessary, as it is already required by the plain language of the claims themselves.

HTC has proposed this construction to set up a noninfringement argument for summary judgment and trial that misreads what it means for a processor to "use" a file. Personal Audio expects HTC to argue that reading the sequencing file into RAM and referencing its data during playback is not sufficient to qualify as being "used by the processor" under HTC's proposed construction. To avoid addressing claim construction issues on the eve of trial, as happened in the *Apple* case with the construction of "downloading," Personal Audio raises the issue now.

**A.   Personal Audio's statements in reexamination proceedings do not constitute disclaimers because they do not narrow the scope of the claims.**

The doctrine of prosecution disclaimer applies only where the patentee "surrendered claim scope during prosecution" through a clear and unmistakable disavowal. *Elbex Video v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007). Where the patentee's statements do not narrow the scope of the claims, there is no disclaimer.

Personal Audio's statements in reexamination do not disclaim claim scope because they are entirely consistent with the claim language itself and this Court's prior constructions. HTC

notes its proposed construction is almost identical to the construction for "sequencing file" that Personal Audio proposed in the *Apple* case. *See* Ex. A at 18. HTC also correctly notes that the Court ultimately did not adopt Personal Audio's proposed "sequencing file" construction in the *Apple* case. *Id.* at 20-21. However, in doing so the Court did not reject Personal Audio's argument that the sequencing file must be received and used by the player to control playback and respond to control commands. Instead, the Court found that the meaning of the proposed language was already explicit in other language of the claims, and thus did not need to be incorporated into its construction for the "sequencing file" terms. *See id.* at 18. For example, the claims already require that the sequencing file be downloaded or received. *See, e.g.,* '076 patent, claim 1 ("means for receiving . . . a file of data establishing a sequence"); '178 patent, claim 1 ("a data communications link for downloading . . . a separate sequencing file"). The claims require that the sequencing file be stored. *See, e.g.,* '076 patent, claim 1 ("means for storing . . . a file of data establishing a sequence"); '178 patent, claim 1 ("a digital memory unit . . . for persistently storing . . . said separate sequencing file"). The claims also require that the sequencing file be used to control playback of the audio segments. *See, e.g.,* '178 patent, claim 14 ("an audio playback unit for automatically . . . reproducing said audio program files . . . in the ordered sequence *specified by said playback session sequencing file* in the absence of a control command from said listener") (emphasis added). Thus, Personal Audio's statements during reexamination did not disclaim claim scope because they did not narrow the scope of the claims.

The reexamination statements cited by HTC are also irrelevant as to how the sequencing file is used. Personal Audio's comments in reexamination explained that the DAD Manual's disclosure of the IMPORT PLAYLIST function to obtain a DAD playlist does not meet the limitations of the claims because (1) the DAD playlist is not the file that is received and

persistently stored by the DAD system; and (2) the source data file which gets translated into the DAD playlist is not the file used for playback. It is just not the same file. Notably, the statements HTC cites say nothing about *how* the sequencing file is used by the processor. The only issue was that the same sequencing file, as explicitly recited in the claims, was not both received by the player, and used by the processor. There simply was no further limitation added to the claims, and therefore no disclaimer regarding the sequencing file or how it is used. Consequently, the Court's prior construction of the "sequencing file" claim terms remains correct, and should be adopted.

**B.  HTC's proposed construction is unnecessary so long as "used by the processor" is understood as that phrase has been consistently used by Personal Audio.**

HTC has provided no explanation for why it seeks this construction. Personal Audio and the Court are left to guess. Personal Audio believes the construction is unavailing and unnecessary so long as "used by the processor" is understood in the same way Personal Audio has expressed to this Court before.

Personal Audio has consistently represented, both in litigation and elsewhere, that the processor reading the sequencing file into RAM and then using that data in RAM to control playback constitutes "using" the sequencing file. For example, in its claim construction reply brief in the *Apple* case, Personal Audio explained how processors such as the one found in the claimed player "use" files:

> As proposed by Personal Audio, the sequencing file is "used by the processor." Like any file used by a processor, data from the file is read into volatile memory so it can be used, in this case, during a personalized playback session as claimed. Thus, the information or data in the sequencing file is used to "control playback . . . and respond to control commands" as proposed by Personal Audio.

Ex. N at 3-4. Personal Audio made this same representation in its technology synopsis:

Slide 23 sets forth a simplified flow chart depicting how a processor could use data stored in a file. Before the processor can use the data, it sends a command to copy the needed data from persistent storage into RAM storage. Once the data is move, the processor can reference the data stored in RAM as needed. If during the processor's activity it must reference the data again, the processor refers to the copy of data stored in RAM, not the copy of data stored in persistent storage. Storing a copy of the data in RAM means the processor does not need to read the same data stored in persistent storage again, as doing so would reduce processor performance.

Ex. J at 5-6; *see also* Ex. K.

HTC should not be granted an unnecessary construction, only to use it in a manner inconsistent with Personal Audio's position throughout litigation and reexamination.

**C.    If further construction is necessary, "used by the processor" should be given its plain and ordinary meaning.**

As the Court may recall, it had to perform a derivative construction for the word "request" in its "downloading" construction shortly before trial in the *Apple* case. Depending on HTC's noninfringement strategy, that same process may be required here. "[I]n those cases in which the correct construction of a claim term necessitates a derivative construction of a non-claim term, a court may perform the derivative construction in order to elucidate the claim's meaning." *Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc.,* 674 F.3d 1365, 1373 (Fed. Cir. 2012). When construing a word not found in a claim term, courts must apply the ordinary canons of claim construction as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *Advanced Fiber*, 674 F.3d at 1374.

If HTC's noninfringement position ever necessitates further clarification regarding how a processor can use a file, the plain and ordinary meaning of that phrase should control. As explained above, a person of ordinary skill in the art would understand that reading a file's data into RAM for later use during the execution of a program constitutes using that file.

**II.    The Court's "Continuous play" algorithm is complete and sufficient to perform the corresponding function.**

This Court has already undertaken a detailed analysis of the specification to determine the appropriate algorithm for continuously reproducing audio program files. HTC now seeks to add algorithmic structure from two totally different claim limitations—"skipping forward" and "skipping backward"—into the corresponding structure for the "continuous play" limitations for the sole purpose of manufacturing a noninfringement argument.[8] HTC's proposed construction, however, is entirely unsupported by the specification, improperly narrows the scope of the claims, and is, even under HTC's own reasoning, unnecessary. Personal Audio respectfully requests that the Court adopt its previous construction for the "continuous play" claim term.

Preliminarily, Personal Audio renews its objection to the Court's determination that a "scanning for the appropriate LocType" step is corresponding structure for any claim limitation (namely skipping forward or backward and, according to HTC, continuous play). As outlined in Personal Audio's letter to the Court of May 14, 2012, Personal Audio objected to the inclusion of a "scanning for the appropriate LocType" step in the context of skipping forward and backward through a sequence of program segments. D.I. 88 at 2. This step is not necessary for a sequencing file comprised of only "P" program segments, which is all the claims and specification require. The specification discloses two separate algorithms for skipping forward and backward: 1) an algorithm used when the sequence of files includes only program segments, which works by simply advancing to the next program segment in the sequence through incrementing the CurrentPlay variable ('076 patent, col. 15, ll. 21-25); and 2) an algorithm used

---

[8]    HTC proposes changes to the constructions for both "means for continuously reproducing said program segments in the absence of a control command" ('076 patent, claim 1) and "a processor for continuously delivering a succession of said audio program files in said collection to said audio output unit in said ordered sequence specified by said sequencing file in the absence of a program selection command from said listener" ('178 patent, claim 1). Because the changes to the Court's previous constructions are identical for both terms, and for convenience, Personal Audio will collectively refer to these terms as the "continuous play" limitations.

when the sequence of program segments is subdivided to include "topic" and/or "subject" segments. ('076 patent, col. 15, ll. 25-42). The second algorithm implements the step of scanning for a Selection_Record of the appropriate LocType. The asserted claims only address the ability to navigate between "audio program segments." The asserted claims do not address a sequencing file with "subject and topic segments," and certainly not skipping between subject and topic segments. Only the simpler of these two algorithms is necessary to satisfy the requirements of the claim language. Thus, because a "scanning for the appropriate LocType" step is not necessary for skipping forward or backward, it is similarly not necessary for continuously playing a sequence of program files. Personal Audio does not expect the Court to change its prior constructions, but urges the Court not to expand the "scanning for the appropriate LocType" step to another claim element where it does not belong.

A.    **HTC's proposed construction is not supported by the specification.**

HTC's proposed change to the Court's prior constructions should be rejected because it is not supported in the specification. For a means-plus-function limitation, structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008); *see also* Ex. C at 5. The recited function for the "continuous play" claim limitation is "continuously reproducing said program segments in the order established by said sequence in the absence of a control command." Ex. B at 22. The identified corresponding algorithmic structure is from a portion of the specification describing continuous playback of audio program segments. The specification explicitly states that during playback of a subject announcement, if no skip command is given, "the CurrentPlay register is incremented by one when the subject announcement concludes, causing the "T"

Selection_Record 364 to be used to fetch and play the topic announcement specified by the ProgramID in the Location field of record 364." '076 patent, col. 34, ll. 45-49. Like "P" (programming content) segments, both the "S" (subject) and "T" (topic) selection records correspond to audio files. This language links to the claimed continuous play function because it describes how the player continuously plays one audio file after another.

HTC has requested that the Court add to its previously-identified "continuous play" algorithm the step of scanning forward in the sequencing file to locate the next Selection_Record of the appropriate LocType. HTC's proposed addition is unsupportable because there is no language that links the identified scanning language to the "continuous play" function. HTC does not identify a single place in the specification of the patent where the player scans forward during continuous playback. Instead, HTC engages in logic exercises using hypothetical sequencing files that reflect optional features to the claimed invention. The "scanning" step proposed by HTC is not even tangentially linked to the function of continuously reproducing audio program segments. It is instead linked to the functions of skipping forward or backward through a sequencing file containing "topic" or "subject" segments. Accordingly, HTC's argument to modify the continuous play algorithm should be rejected because it is devoid of any specification support.

## B. HTC's proposed construction includes structure not necessary to perform the recited function.

HTC's proposed new algorithmic step is also improper because it is not necessary to perform the function recited in the claims. "Features that do not perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003). When identifying corresponding structure, the Court may not import into the claim structures that are unnecessary

to perform the claimed function. *Id.*; *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003) ("the structure must be necessary to perform the claimed function"). HTC's entire argument is fundamentally flawed because it presupposes the existence of optional features of the invention that do not perform the functions recited in the claims.

The specification of the patents-in-suit informs the reader that many of the specialized features described within the specification—such as hyperlink passages and highlight passages— are *optional*, and not necessary for the claimed invention to function. *See* '076 patent, col. 30, ll. 60-62 ("[t]o further facilitate rapid skimming, the player *may be adapted* to support playback in what is here termed the 'play highlights' mode") (emphasis added); col. 31, ll. 13-14 ("[i]n addition, the structured program files *may advantageously contain*, where appropriate, 'hyperlink' passages . . . ") (emphasis added). In its prior order construing the means-plus-function claims of the patents-in-suit, this Court recognized that these "bells and whistles" were optional features of the invention, not requirements:

> The sequencing file *may optionally contain* Selection_Records that hold the location of items other than program segments, such as offsets for highlighted passages within a program segment ("H") or image files ("I"). *See* '076 patent, col. 32, ll. 10-65.

Ex. B at 18 n.9 (emphasis added). The claims asserted against HTC—claims 1-4, 14, and 15 of the '076 patent and claims 1-7, 14, 15, and 28 of the '178 patent—do not claim the ability to play or use hyperlink or highlight Selection_Records. They claim the capability to reproduce audio program files.

The additional language proposed by HTC is targeted at these optional features, and is, accordingly, unnecessary. For the "continuous play" element at issue, the recited function is "continuously reproducing said <u>program segments</u> in the order established by said sequence in the absence of a control command." The recited function is not "continuously reproducing said

14

program segments, <u>hyperlink passages, and highlight passages</u>." Whether or not the "continuous play" algorithm handles unclaimed, optional features of the invention like "H" and "E" highlight records or "A" and "B" anchor records is irrelevant to the claimed function. The only types of item that *must* be accurately played by the correct "continuous play" algorithm are "P" program segments. And HTC does not deny that the "continuous play" algorithm identified by the Court would correctly and continuously plays a sequencing consisting of only "P" program segments.

C.    **The Court's previously identified algorithmic structure would work on a sequencing file like the one shown in Figure 5.**

As stated above, it is not necessary for the "continuous play" algorithm to reproduce completely optional features like hyperlink passages and highlight passages. Nothing in the specification mandates that a sequencing file contain any type of file other than "P" programming segments. Figure 5 is an illustrative embodiment, not a limitation on the claims.

Nevertheless, HTC is also mistaken when it asserts that the algorithm identified by the Court would not be able to continuously play a sequencing file like the one shown in Figure 5. The "continuous play" algorithm contains the following algorithmic steps:

> 1) beginning playback with the audio program file identified by the ProgramID contained in the Selection_Record specified by the CurrentPlay variable;
>
> 2) when the currently playing audio program file concludes, incrementing the CurrentPlay variable by one and fetching and playing the audio program file identified by the ProgramID contained in the next Selection_Record in the sequencing file; and
>
> 3) repeating step (2) until the last Selection_Record in the sequencing file is reached, which resets the CurrentPlay variable to 'I' to begin the playing sequence again with the first Selection_Record in the sequencing file.

HTC's only argument in support of its proposed "continuous play" construction is that the player will not be able to "fetch and play" optional types of Selection_Records like "H" and "L"

records, because the Location field of these Selection_Records contains offset data, and not a ProgramID. HTC therefore claims that the algorithm "fails."

However, HTC completely ignores the third step of the algorithm when describing its operation. It is true that the player will not be able to "fetch and play" a hyperlink passage by its ProgramID, because a hyperlink Selection_Record does not contain a ProgramID. And if "fetching and playing" were the final step in the algorithm identified by the Court, this might indeed be a problem. However, the algorithm specifies that after the player attempts step 2 of the algorithm, it moves to step 3. Step 3 of the algorithm instructs the player to go back and repeat step 2—incrementing the CurrentPlay variable by one and attempting to fetch and play the next Selection_Record. Contrary to HTC's assertion, if the player encounters a Selection_Record that does not contain a ProgramID, it simply moves on to step 3 of the algorithm and tries again.

The algorithm identified by the Court causes the player to increment the CurrentPlay variable one integer at a time, sequentially moving through each Selection_Record in the sequencing file. Where the Selection_Record contains a ProgramID, the player fetches and plays the associated audio file before incrementing the CurrentPlay variable and moving to the next Selection_Record. And where the Selection_Record does not contain a ProgramID—such as an "H" highlight record—the player attempts to fetch an audio program file, fails, and then increments the CurrentPlay variable by one and tries again. In this way, the algorithm described by the Court continuously reproduces the audio program files specified by the sequencing file without the need to scan for the next Selection_Record of an appropriate LocType.

## III.    The "continuous play" algorithm does not require an endless circular loop.

The function of "continuously reproducing said program segments in the order established by said sequence in the absence of a control command" does not require that the player look for

16

or respond to an "R" Selection_Record that resets the CurrentPlay variable to one. As Personal Audio has previously pointed out, both in the *Apple* case, *see* Case No. 9:09-cv-111, D.I. 302, and in the present litigation, *see* D.I. 88, Personal Audio maintains its objection to the Court's construction of the "continuous play" limitation. In Personal Audio's view, the algorithm identified as corresponding structure by the Court already improperly reads in an endless loop function and corresponding structure, instead of simply continuous playback of the claimed sequence. It also runs contrary to the principle of claim differentiation. HTC's proposed change to the construction would only further exacerbate this problem, and add even more unnecessary detail to the Court's algorithm.

The function claimed by the "continuously playback" claim limitations is simple: "continuously reproducing said program segments in the order established by said sequence in the absence of a control command." The plain meaning of this language does not require that the player reproduce the same segments over and over in perpetuity. The specification indicates the exact opposite—that the purpose of the invention is to reproduce a sequence of files a single time, without interruption. "[T]he present invention takes the form of an audio program player which automatically plays a predetermined schedule of audio program segments." Nothing in the specification indicates that the word "continuously" should be given the same meaning as the word "endlessly." And the inventors clearly understood that "endless" and "continuous" were separate words and concepts, as both words are used consistently to mean different things throughout the specification and even in the claims themselves. *See, e.g.,* '178 patent, claim 7 (claiming a "bidirectional endless loop," not a "bidirectional continuous loop").

Similarly, the doctrine of claim differentiation indicates that the "continuous play" algorithm should not include an "R" record. Each claim in a patent is presumed to be different in

scope. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). A limitation found in a dependent claim is presumptively not included in the independent claim from which the claim depends. *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005). While claim differentiation "cannot be used to make a claim broader than what is contained in the written description . . . it prevents the narrowing of broad claims by reading into them the limitations of narrower claims." *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1445-46 (Fed. Cir. 2000).

In the present case, the Court's previously adopted construction of "continuous play" runs directly contrary to this canon of claim construction. Claim 1 of the '076 patent includes as one of its limitations "means for continuously reproducing said program segments in the order established by said sequence in the absence of a control command." Claim 4 of the '076 patent depends directly from claim 1, and has as its only additional limitation "wherein said sequence established by said data forms an endless circular sequence of program segments." By construing the "continuous play" algorithm to always result in endless sequential playback of program segments, the Court gave claims 1 and 4 of the '076 patent identical scopes. Further narrowing this limitation by importing algorithmic steps from claim 7 of the '178 patent—a claim that explicitly claims an endless circular sequence of programs—would only serve to compound the error further. The Court's algorithm should actually be amended to remove an endless loop step, rather than reading in further unnecessary details as HTC requests.

## IV. The algorithm identified by the Court for the "Go" command is complete and sufficient to perform the corresponding function.

The Court has already undertaken an analysis of the specification to determine the appropriate algorithmic structure for the "Go" command limitation. When a "Go" command is given, the player "switches the current playback position in the program sequence file 214 to the

new setting at 269, and the playback continues at 235." '178 patent*, col. 14, ll. 35-39. Resetting the playback position involves resetting the CurrentPlay variable to the location of the Selection_Record that the listener selected with the "Go" command. *Id.* This process is accurately reflected in the Court's algorithm.

HTC seeks to improperly limit the corresponding structure for this limitation by restricting it to only one of several methods of implementing a "Go" command. The specification of the patents-in-suit discloses that a "Go" command can be issued in one of several ways. One method is through the use of a spoken command, such as "FIVE," which will cause an immediate shift to the fifth program segment. '076 patent, col. 14, ll. 20-25. A user can also give the player a "Go" command by selecting a program segment from a scrollable list of available program segments using a mouse, trackpad, or hand controller. *Id.* at col. 14, ll. 26-30. The user can also issue a "Go" command by selecting a hyperlinked portion of a program segment during playback. *Id.* at col. 35, l. 61 – col. 36, l. 2. The present construction of "Go" accommodates these various ways to shift to the selected audio file by identifying the minimum amount of structure necessary to perform the function.

Nevertheless, HTC focuses exclusively on the specification's optional hyperlinking functionality in its claim construction brief, to the exclusion of all else. HTC argues that the Court's prior construction for the "Go" command is incomplete, because it does not include a step for "determining which of the Selection_Records in the sequencing file is the 'listener-selected Selection_Record." Def. Br. at 15-16. HTC's argument is based exclusively on the following passage:

> Whenever the user issues a "Go" command (seen at 265 in Fig. 3), the player will execute a hyperlink jump **to the location indicated by the last "L" record in the selection file**. When the jump is made, the location in the "L" record is inserted into the CurrentPlay register 353 . . . .

Def. Br. at 16 (emphasis in original). HTC fails, however, to inform the Court that the passage above only applies to "Go" commands entered through the third method identified above— selection of a hyperlink. This is made explicit by the language immediately preceding and following HTC's selected language. In context, the language HTC relies upon reads as follows:

> Hyperlinks are implemented by means of anchor passage identifiers, the "A" and "B" Selection records which respectively identify the anchor passage, and a "L" link identifier which holds the location of a subject, topic or highlight Selection_Record . . . Whenever the user issues a "Go" command (seen at 265 in Fig. 3), the player will execute a hyperlink jump to the location indicated by the last "L" record in the selection file. When the jump is made, the location in the "L" record is inserted into the CurrentPlay register 353 . . . The hyperlink capability described above may be used to implement a program menu of the type described earlier in connection with FIG. 3.

*Id.* at col. 35, l. 54 – col. 36, l. 11. And as this Court has previously recognized, the use of hyperlinks is a purely optional feature of the invention. *See* Ex. B at 44 n.14 ("Optionally, 'Go' commands may be implemented in conjunction with 'hyperlinks' in a program segment that link to other related program segments").

Indeed, the additional algorithmic step proposed by HTC for the "Go" command would be nonsensical outside of the context of a hyperlink jump. As the first part of the specification quoted above makes clear, "L" records are only used in relation to hyperlinked or bookmarked passages.'076 patent, col. 35, ll. 54-58. In fact, the "L" in "L record" stands for "linked segment." *Id.* at col. 32, l. 24. If the user enters a "Go" command by selecting a hyperlink, the player will need to consult an "L" record to find the appropriate selection record to jump to. But if the user inputs a "Go" command through one of the other input methods disclosed in the specification—such as through a voice command or use of a mouse or handheld controller—no hyperlink will have been used, and no "L" record would need to be consulted.

By focusing exclusively on language in the specification relating to hyperlinks, HTC is attempting to improperly constrain this claim element beyond the function recited in the patent. The function identified by the Court is not "in response to a 'Go' command <u>entered via a hyperlink</u> . . . "; it is simply "in response to a 'Go' command." Because HTC's proposed algorithm relates to only one of several acceptable ways to perform a "Go" command, it is an improper attempt to limit the claim term beyond its express meaning, and should be rejected.

**V.     The "downloading" limitation does not require a request for a specific file, only a request to initiate a data transfer.**

This Court has construed the "downloading" terms from the '178 patent on multiple occasions. In its initial claim construction order in the *Apple* case, the Court chose not to construe downloading according to its plain and ordinary meaning. Instead, the Court further limited the term to require transferring a plurality of audio program files and a separate sequencing file "upon a request by the player." Ex. A at 31-42. Later, in the summary judgment phase, the Court further narrowed its construction by specifying that the "request" needed to be a communication to initiate the transfer. *See* Case No. 9:09-cv-111, D.I. 430 at 15 (June 21, 2011). HTC now asks the Court to restrict the meaning of "download" even further to require that the request from the player not only be a specific communication to initiate the transfer of files, but that it also specifically identify the audio program files and separate sequencing file that are to be transferred. That is not a construction of a claim term, but a wholesale redrafting of the claim. HTC's proposed language improperly imports limitations from the specification and excludes a preferred embodiment of the invention. It should therefore be rejected.

### A. HTC's proposed construction would improperly import limitations from the specification into the claims.

"Absent a special and particularized definition created by the patent applicant, terms in a claim are to be given their plain and ordinary meaning." *Reinshaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998). As articulated in Personal Audio's letter of May 14, 2012 (D.I. 88), the Court's prior definition of "downloading" already exceeds the term's plain and ordinary meaning by requiring a request from the player that initiates the data transfer.

Even accepting the Court's conclusion that "downloading" must be understood in the context of a client/server relationship, and must be a "pull"- and not a "push"-type communication, a person of ordinary skill in the art would understand that a client need not provide a specific identification of files in order to download information from a server.[9] This fact is demonstrated by the multiple relevant dictionary definitions cited to by the Court in its *Markman* order from the *Apple* case. None of the referenced dictionary definitions of "client" or "server" require the client to make a request *for a specific file identified by the client*:

- *The IEEE Standard Dictionary of Electrical and Electronics Terms* defines "client-server" as "[i]n a communications network, the client is the requesting device and the server is the supplying device. For example, the user interface could reside in the client workstation while the storage and retrieval functions could reside in the server database." Ex. A at 35.

- *Academic Press Dictionary of Science and Technology* 1963 (Christopher Morris ed., 1992) ("server" means "any device that is *connected to a network* and provides a service . . . in response to requests from computers connected to the network"). *Id.*

- *Academic Press Dictionary of Science and Technology* 445 (Christopher Morris ed., 1992) ("client" can mean "in data management, a user terminal *requesting* access to a database that resides on the host computer"). *Id.* at 41.

---

[9] As Personal Audio noted in its claim construction briefing in the *Apple* case, the commonly-understood meaning of downloading is simply to transfer data, which would include both "push" and "pull" types of information transfer. *See* Ex. O (defining "download" as "to transmit a file or program from a central computer to a smaller computer or a computer at a remote site")

These definitions establish that a client/server relationship requires only that the client be able to make requests to the server. The nature of the client/server relationship does not dictate what type of requests can be made.

Nevertheless, in support of its proposed restriction, HTC cites to examples in the specification where a download request contains information about the files requested. This is a transparent attempt to import a limitation from the specification that would not otherwise be understood from the language of the claims. "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005). Because the ordinary meaning of "downloading" does not require a request from the client to the server identifying the file or files to be received, HTC's proposed construction is incorrect.

### B. HTC's construction is inconsistent with a preferred embodiment of the invention.

HTC's proposed construction for "downloading" also fails because it excludes a disclosed preferred embodiment. "A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004).

Broadly speaking, one preferred embodiment of the invention described in the specification consists of two separate aspects: 1) a player for reproducing audio program segments via a sequencing file; and 2) a separate host server for identifying, selecting, and transferring audio program segments and a sequencing file. The player described in the specification has the capability to download to the player audio program files *selected by the user* prior to the download. But a preferred embodiment of the player described in the

specification also has the ability to download program segments *selected for the user by a server computer* based on past preferences and listening data:

> In accordance with the invention, the host server receives and supplements the user's initial selection of a sequence of desired programs, first by adding the program selections specified in failed hypertext requests as indicated by the Usage_Log Table 333 during usage log processing at 350, and then *by adding advertisements, announcements, and additional program segments tailored to the subscriber's known preferences* as indicated at 340 in FIG. 4, thereby producing the recommended Schedule Table 307 *which is transferred to the subscriber, along with program segments, during the download transfer. Indeed, if the subscriber provides no selections at all, the host will prepare a Schedule Table 307 containing program segment[s] selected entirely by the host on the subscriber's behalf.*

'076 patent, col. 18, ll. 21-34 (emphasis added). The Schedule Table 307 compiles to a sequencing file. *Id.* at col. 12, ll. 3-10.

HTC's proposed construction completely ignores this aspect of the specification. Under HTC's proposed construction of "downloading," any download request "must identify the file(s) the player wishes to download." Def. Br. at 17. Yet the language above makes clear that if a user does not select programming that he wishes to receive prior to beginning the download process, the host server—and *not the player*—will determine the program segments, advertisements, and sequencing file that will be downloaded to the player. In this embodiment, the request from the player cannot possibly identify the file(s) that the player will download, because that information is known only to the host server.

Because HTC's proposed construction for downloading excludes a preferred embodiment of the invention for no reason, it should not be adopted by the Court.

## VI.   The language of the preambles provides meaning and vitality to the claims.

This Court should keep its prior constructions for terms occurring in the preambles of the independent claims. A preamble may be construed as limiting if it recites essential structure or

steps, or if it is necessary "to give life, meaning, and vitality" to the claim. *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010). In the present case, the "player for reproducing selected audio program segments" language found in the preambles of the independent claims is limiting because it gives necessary meaning and vitality to the claims.

The invention described in the specification of the patents-in-suit is multifaceted and complex. The specification describes sophisticated player-side and server-side architecture for structuring, playing, and transferring audio program files and sequencing files. Just with respect to the player, the specification describes numerous specialized features like hypertext linking, highlight passages, and targeted advertising.

In this context, the phrase "player [or programmed digital computer] for reproducing selected audio program segments" is limiting because it gives meaning to the claimed invention. This language indicates that the claimed invention is an audio program player, which informs those reading the patent that the server-side innovations from the specification are not what the patents claim. The preamble also illustrates that the purpose of the invention is not to integrate sophisticated and optional "bells and whistles," but simply to reproduce audio program segments. Given that HTC repeatedly attempts to limit the invention to its optional features through its proposed constructions—features like hyperlinked passages and "subject" and "topic" headers—this defining language is of key importance in defining the scope of the invention.

## Conclusion

For the foregoing reasons, Personal Audio respectfully requests that the Court adopt its proposed constructions for the disputed claim terms.

Dated: September 27, 2012

Respectfully submitted,

By:   s/ Cyrus A. Morton
Ronald J. Schutz   (MN Bar No. 130849)
(Eastern District of Texas Member)
(Lead Counsel)
Jake M. Holdreith  (MN Bar No. 211011)
(Eastern District of Texas Member)
Cyrus A. Morton (MN Bar No. 287325)
(Eastern District of Texas Member)
David A. Prange (MN Bar No. 329976)
(Eastern District of Texas Member)
Patrick M. Arenz  (MN Bar No. 0386537)
(Eastern District of Texas Member)
Daniel R. Burgess (MN Bar No. 0389976)
(Eastern District of Texas Member)
**Robins, Kaplan, Miller & Ciresi L.L.P.**
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
Telephone: (612) 349-8500
Facsimile:  (612) 339-4181
E-mail:    RJSchutz@rkmc.com
              JMHoldreith@rkmc.com
              CAMorton@rkmc.com
              DAPrange@rkmc.com
              PMArenz@rkmc.com
              DRBurgess@rkmc.com

Annie Huang  (MN Bar No. 0327979)
(Eastern District of Texas Member)
**Robins, Kaplan, Miller & Ciresi L.L.P.**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:   (212) 980-7400
Facsimile:   (212) 339-4181
E-mail :        Ahuang@rkmc.com

Lawrence Louis Germer
(TX Bar # 07824000)
Charles W. Goehringer, Jr.
(TX Bar # 00793817)
**Germer Gertz, L.L.P.**
550 Fannin, Suite 400
P.O. Box 4915
Beaumont, Texas 77701
Telephone: (409) 654-6700

Telecopier: (409) 835-2115
E-Mail:    llgermer@germer.com
            cwgoehringer@germer.com

**Attorneys for Plaintiff Personal Audio, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service, are being served this 27th day of September, 2012, with a copy of this document via the Court's CM/ECF system under Local Rule CV-5(a)(3).

s/ Daniel R. Burgess